Eric M. Schiffer
Email: eschiffer@schifferapc.com
SCHIFFER, APC
7545 Irvine Center Drive, Suite 200
Irvine, CA 92618
Telephone: (949) 533-0485

Christopher E. Hanba (*pro hac vice pending*)
Email: chanba@dickinson-wright.com
Joshua G. Jones (*pro hac vice pending*)
Email: jjones@dickinson-wright.com
DICKINSON WRIGHT PLLC
607 W. 3rd Street, Suite 2500
Austin, Texas 78701
Telephone: (512) 770-4200
Facsimile: (844) 670-6009

[Additional counsel listed on signature page]

*Attorneys for Plaintiff*
*Jonathan E. Jaffe*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JONATHAN E. JAFFE, an individual<br><br>Plaintiff,<br><br>v.<br><br>ADOBE, INC.<br>a Delaware corporation<br><br>Defendant. | Case No.<br><br>**PLAINTIFF JONATHAN E. JAFFE'S ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Jonathan E. Jaffe ("Jaffe") files this Complaint for Patent Infringement and Demand for Jury Trial against Adobe, Inc. ("Adobe") for infringement of United States Patent No. 6,757,828 (the "'828 Patent").



## THE PARTIES

1. Plaintiff Jonathan E. Jaffe is an individual who currently resides in Gallatin, TN.

2. Defendant is a Delaware corporation with its principal place of business located at 345 Park Avenue, San Jose, CA 95110.  It may be served at Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

## JURISDICTION AND VENUE

3. This is an action for patent infringement arising under the patent laws of the United States, Title 35, United States Code, including 35 U.S.C. §§ 154, 271, 281, and 283-285.

4. This Court has exclusive subject matter jurisdiction over this case for patent infringement under 28 U.S.C. §§ 1331 and 1338.

5. Adobe is subject to the general and specific personal jurisdiction of this Court, based upon its regularly conducted business in the State of California and in the Central District of California ("District"), including conduct giving rise to this action including at least by making, using, offering to sell, selling, or putting into serve the accused products, systems, or services within the District, thus committing, acts of infringement within the District,  and placed infringing products, systems, or services into the stream of commerce knowing or understanding that such products, systems, or services would be used in the Central District of California.

6. Venue is proper in this Court under 28 U.S.C. §§ 1400(b) because a substantial part of the events or omissions giving rise to these claims occurred in this district and because Adobe has a regular and established place of business in this District located at 3640 Holdrege Ave, Los Angeles, CA 90016.

## THE '828 PATENT

7. Mr. Jaffe is the co-inventor and owner of United States Patent No. 6,757,828 (the "'828 Patent") titled "Indigenous authentication for sensor-recorders and other information capture devices" including the right to sue for all past infringement.  A true and correct copy of the '828 Patent is attached at Exhibit A.

8. The '828 Patent issued from U.S. Patent Application No. 09/626,044 filed on July 27, 2000.



PLAINTIFF'S ORIGINAL COMPLAINT                                                                                                    CASE NO.

9. The Patent Office issued the '828 Patent on June 29, 2004, after a full and fair examination.

10. The '828 Patent was valid until its expiration on July 3, 2022.

11. The '828 Patent relates to a method and apparatus for acquiring and recording a sample of an environment in order to provide authentication for sensor-recorders and other information capture devices.

12. The inventors of the '828 Patent recognized that, in digital environments, there is great potential for alteration of images, data files, and audio and video recordings. Indeed this problem has become even more pronounced in recent years with the increase in generative artificial intelligence.

13. The '828 Patent provides several advantages over the prior art because the invention does not require that one know which device was used to create a digital file prior to authenticating a given digital file and, additionally, encryption is not required for authentication which decreases manufacturing costs for information storage devices.

14. The '828 Patent describes and claims a specific way to authenticate digital files by using aspects of the environment in which the digital file was created such as date, time, latitude, longitude, altitude, roll, pitch, yaw, and compass heading.

15. Claim 1 of the '828 Patent reads:

1. A method for authenticating a data stream stored in a data file in memory, said method comprising the steps of:
storing a data stream in a data file in a memory;
utilizing a sensor, which is tightly coupled to said memory, to generate at least one internal and unique parameter;
monitoring the integrity of the tight coupling between said memory and said sensor when said at least one internal and unique parameter is generated, and, if said integrity is compromised, then also providing an indication of said compromised integrity;
utilizing a signature protocol to generate a first signature based on said data stream and said at least one parameter, said first signature being generated without altering said data stream and being appended to said data file in said memory;
utilizing said signature protocol to generate a second signature based on said image;
comparing said first signature to said second signature,

if said first and second signatures are not the same, then generating an error signal that is displayed to a user to indicate that said stored data stream is not authentic, and

if said first and second signatures are the same, then generating an ok signal that is displayed to a user to indicate that said stored data stream is authentic.

## ADOBE

16. Upon information and belief, Adobe is a multinational software company founded in 1982.

17. Upon information and belief, Adobe has more than 29,000 employees and earned approximately $17.6 billion in revenue in 2022.

18. Adobe sells ubiquitous software products throughout the world including Acrobat and Photoshop.

## COUNT I– INFRINGEMENT OF
## THE '828 PATENT

19. Mr. Jaffe repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

20. Adobe makes, uses, offers to sell, and sells in the United States products, including content attribution tools, also called "content credentials" within its Creative Cloud suite of software products and launched the Content Authenticity Initiative which is a standard for digital content provenance (the "Accused Products").



> **The Content Authenticity Initiative unveils content attribution tool within Photoshop and Behance**
>
> Today, we are unveiling a preview of our attribution tool in Adobe Creative Cloud. This feature will be available to select customers in pre-release within Photoshop and Behance in the coming weeks. The tool is built using an early version of the open standard that will provide a secure layer of tamper-evident attribution data to photos, including the author's name, location and edit history. This will help consumers better understand the content they view online and give them greater confidence to evaluate its authenticity.

Content Attribution Tool, https://blog.adobe.com/en/publish/2020/10/20/content-authenticity-initiative-unveils-content-attribution-tool-within-photoshop-behance.html#gs.x05anq

21. The Accused Products employ a method for authenticating a data stream stored in a data file in memory.

> **Why use Content Credentials?**
>
> Using Content Credentials is an easy way to share content transparently. It can help build credibility and trust with viewers by sharing more information about yourself and your creative process. It can also help prevent the spread of misinformation and disinformation online.
>
> Content Credentials allow you to attach your identity and contact information to your work, giving people more ways to find and connect with you when they encounter your content online. You can also attach important usage details to your content, including whether or not you want Content Credentials-supported AI models to use your content for training purposes.

https://helpx.adobe.com/creative-cloud/help/content-credentials.html

22. The Accused Products store a data stream in a data file memory.



PLAINTIFF'S ORIGINAL COMPLAINT

5

CASE NO.



Content Attribution Tool, https://blog.adobe.com/en/publish/2020/10/20/content-authenticity-initiative-unveils-content-attribution-tool-within-photoshop-behance

23. The Accused Products utilize a sensor, which is tightly coupled to said memory, to generate at least one internal and unique parameter.

Source: Content Attribution Tool, https://blog.adobe.com/en/publish/2020/10/20/content-authenticity-initiative-unveils-content-attribution-tool-within-photoshop-behance

24. The Accused Products monitor the integrity of the tight coupling between said memory and said sensor when said at least one internal and unique parameter is generated, and, if said integrity is compromised, then also providing an indicating of said compromised integrity.

# Edit anywhere with Lightroom.

Capture photos that match the moment with powerful editing features in an easy-to-use interface on your mobile device, desktop, or the web. Your photos and edits are backed up to the cloud, and organization and search are a snap.

**Source**: Adobe Photoshop Lightroom,

https://www.adobe.com/creativecloud/photography.html

25. The Accused Products utilize a signature protocol to generate a first signature based on said data stream and said at least one parameter, said first signature being generated without altering said data stream and being appended to said data file in said memory.

## 5.4 Digital Signatures

In order to ensure the integrity of the CAI information that is embedded into an asset, including the asset's data itself, digital signature technology is employed. That same technology also provides an authentication mechanism connected to the signer, that provides a way to establish trust in the actors involved in the CAI-enabled workflow.

Because the data being signed is, in signature terms, "arbitrary message content," a standard Cryptographic Message Syntax (CMS) signature is used to sign the asset. While a simple CMS signature is sufficient, CAI recommends using a CMS Advanced Electronic Signature (CAdES) instead. Use of a CAdES-compliant signature will ensure that the CAI data complies with the European eIDAS legislation.

It is also recommended that the signer should use a trusted timestamp authority to generate a trusted time-mark or time-stamp token. This is for proving that the signature itself actually existed at a certain date and time and can be incorporated into the CAdES content-time-stamp attribute to create a CAdES-T compliant signature.

Content Attribution Initiative Whitepaper, https://acrobat.adobe.com/link/track?uri=urn%3Aaaid%3Ascds%3AUS%3A2c6361d5-b8da-4aca-89bd-1ed66cd22d19&viewer%21megaVerb=group-discover



*Id*.

26. The Accused Products utilize the signature protocol to generate a second signature based on the said data stream.



Content Authentication Initiative Whitepaper, https://acrobat.adobe.com/link/track?uri=urn%3Aaaid%3Ascds%3AUS%3A2c6361d5-b8da-4aca-89bd-1ed66cd22d19&viewer%21megaVerb=group-discover

27. The Accused Products compare the first and the second signature.



1. A capture device captures an image and concurrently creates a set of assertions about the image such as capture location, equipment details, identity of the user, and perhaps a representative thumbnail. These assertions are embedded in the asset.
2. A claim, referring to the set of assertions and including a hash of the image, is created and cryptographically signed by a trusted signing authority on behalf of the user. The claim is then embedded into the image and a reference to it stored in the asset's metadata (see "Figure 1: Creating a Claim").
3. The image, with its attached claim, is imported into an editing tool. The prior claim is verified (see "Figure 2: Validating Claims"), such that upon successful verification its assertions and claims can be carried forward as the image's history is accumulated.
4. As edits are made, additional assertions are captured and stored in a cloud service. Upon image export, these are gathered together as part of a second claim along with the hash of the updated image. A URL to the claim is stored in the asset's metadata. This new claim (which is also stored in the cloud) refers to the prior claim, therefore ensuring that all assertions from both claims are accessible via the exported image without any link to the prior version of the image.
5. The edited image, with its CAI metadata attached, is shared on a platform.
6. A content consumer encounters the image on the Web via a CAI-enabled viewing experience and sees a visual indication that CAI claims are present.

7. Finally, the content consumer interacts with the visual indicator to learn about the image's history. The most recent claim is retrieved and verified along with the entire chain of claims and their component assertions (see "Figure 2: Validating Claims"). The assertions are displayed to the viewer in a clear, time-ordered user experience depicting the image's claim history from inception to display.

Content Authentication Initiative White Paper, https://acrobat.adobe.com/link/track?uri=urn%3Aaaid%3Ascds%3AUS%3A2c6361d5-b8da-4aca-89bd-1ed66cd22d19&viewer%21megaVerb=group-discover

28. When the Accused Products compare the first and second signatures, if the signatures are not the same, an error is signaled to the user to show the stream is not authentic, if the signatures are the same, then an OK signal is generated to indicate to the user the stream is authentic.

1. A capture device captures an image and concurrently creates a set of assertions about the image such as capture location, equipment details, identity of the user, and perhaps a representative thumbnail. These assertions are embedded in the asset.

2. A claim, referring to the set of assertions and including a hash of the image, is created and cryptographically signed by a trusted signing authority on behalf of the user. The claim is then embedded into the image and a reference to it stored in the asset's metadata (see "Figure 1: Creating a Claim").

3. The image, with its attached claim, is imported into an editing tool. The prior claim is verified (see "Figure 2: Validating Claims"), such that upon successful verification its assertions and claims can be carried forward as the image's history is accumulated.

4. As edits are made, additional assertions are captured and stored in a cloud service. Upon image export, these are gathered together as part of a second claim along with the hash of the updated image. A URL to the claim is stored in the asset's metadata. This new claim (which is also stored in the cloud) refers to the prior claim, therefore ensuring that all assertions from both claims are accessible via the exported image without any link to the prior version of the image.

5. The edited image, with its CAI metadata attached, is shared on a platform.

6. A content consumer encounters the image on the Web via a CAI-enabled viewing experience and sees a visual indication that CAI claims are present.

7. Finally, the content consumer interacts with the visual indicator to learn about the image's history. The most recent claim is retrieved and verified along with the entire chain of claims and their component assertions (see "Figure 2: Validating Claims"). The assertions are displayed to the viewer in a clear, time-ordered user experience depicting the image's claim history from inception to display.

Content Authentication Initiative Whitepaper, https://acrobat.adobe.com/link/track?uri=urn%3Aaaid%3Ascds%3AUS%3A2c6361d5-b8da-4aca-89bd-1ed66cd22d19&viewer%21megaVerb=group-discover

29. Adobe has directly infringed the '828 Patent in violation of 35 U.S.C. § 271(a) by making, using, offering for sale, and selling the Accused Products that embody the patented inventions of at least claim 1 of the '828 Patent.

30. Adobe's infringing products include at least the content attribution tools, also called "content credentials" within its Creative Cloud suite of software products and its products that adhere to the Content Authenticity Initiative and other products with the same or similar functionality that satisfy each element of one or more asserted claims.

31. The Accused Products satisfy each and every element of each asserted claim of the '828 Patent either literally or under the doctrine of equivalents.

32. Adobe's infringing activities are and have been without authority or license under the '828 Patent.

33. Adobe has willfully infringed the '828 Patent. Adobe has had knowledge of the '828 Patent since at least 2007. At that time, Goldhar/Jaffe Technology Development Corporation ("GJTDC"), the original assignee of the '828 Patent, had communications with Adobe about the integration of concepts embodied in the '828 Patent. At Adobe's request, presentations were prepared for Adobe about these concepts. GJTDC provided drafts of the presentations to Adobe for comment, GJTDC received comments from Adobe, and GJTDC modified the presentations to address Adobe's comments. GJTDC sent at least four versions of the presentation to Adobe beginning in January 2007. In February 2007, Cheryl Shimamoto of Adobe informed GJTDC that Adobe "[t]he technology is very interesting, but relevance to our program is marginal. So, rather than have you fly out here, we'd rather stop now." Adobe abruptly terminated all discussions shortly thereafter. These prepared presentations from 2007 still exist.

34. Mr. Jaffe is informed and believes that despite Adobe's knowledge of the '828 Patent and Mr. Jaffe's patented technology, Adobe made the deliberate decision(s) to make, use, sell, or offer to sell products that it knew infringed Adobe's '828 Patent.

35. Mr. Jaffe is informed and believes that Adobe knew or was willfully blind to Mr. Jaffe's technology and the '828 Patent. Despite this knowledge and/or willful blindness, Adobe has acted with blatant and egregious disregard for Mr. Jaffe's patent rights with an objectively high likelihood of infringement.

36. Mr. Jaffe is informed and believes that Adobe has undertaken no efforts to avoid infringement of the '828 Patent, despite Adobe's knowledge and understanding that Adobe's products infringe the '828 Patent. Thus Adobe's infringement of the '828 Patent is willful and egregious, warranting enhancement of damages.

37. As such, Adobe has acted and continues to act recklessly, willfully, wantonly, deliberately, and egregiously engage in acts of infringement of the '828 Patent, justifying an award



11

PLAINTIFF'S ORIGINAL COMPLAINT                                                                                    CASE NO.

to Mr. Jaffe of increased damages under 35 U.S.C. § 284, and attorneys' fees and costs incurred under 35 U.S.C. § 285.

## COUNT II– INDUCED INFRINGEMENT OF THE '828 PATENT

38. Mr. Jaffe repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

39. Adobe is liable for indirect infringement under 35 U.S.C. § 271(b) of at least one claim of the '828 Patent, at least as early as 2007, because it knowingly encouraged, aided, and directed others to make, use, sell, or offer for sale the Accused Products.

40. As detailed above, Adobe was informed by GJTC of the '828 Patent in 2007.

41. Adobe specifically intended the Accused Products to be used and operated to infringe one or more claims of the '828 Patent.

42. Adobe encourages, directs, aids, and abets the use, configuration, and installation of the Accused Products.

43. Adobe's analysis and knowledge of the '828 Patent combined with its past activity demonstrates Adobe's knowledge and intent that the identified features of its Accused Products be used to infringe the '828 Patent.

44. Adobe's knowledge of the '828 Patent combined with its knowledge of the Accused Products and how they are used to infringe the '828 Patent, consistent with Adobe's promotions and instructions, demonstrate Adobe's specific intent to induce infringement the '828 Patent.

45. As set forth above, Adobe knew or was willfully blind to the fact that it was inducing others, including customers, purchasers, users or developers, to infringe by practicing, either themselves or in conjunction with Adobe, one or more claims of the '828 Patent.

46. Mr. Jaffe is entitled to recover from Adobe compensation in the form of monetary damages suffered as a result of Adobe's infringement in an amount that cannot be less than a reasonable royalty together with interest and costs as fixed by this Court.



PLAINTIFF'S ORIGINAL COMPLAINT                                        CASE NO.

## JURY DEMAND

Mr. Jaffe hereby respectfully demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Jaffe prays for relief against Adobe as follows:

(A) An entry of judgment that Adobe has infringed one or more claims of each of the Patents-in-Suit;

(B) An entry of judgment that Adobe has infringed and has indirectly infringed one or more claims of each of the Patents-in-Suit;

(C) An order awarding damages sufficient to compensate Mr. Jaffe for Adobe's infringement of the Patents-in-Suit, in no event less than a reasonable royalty, together with interest and costs;

(D) A determination that Adobe's infringement has been willful, wanton, deliberate, and egregious;

(E) A determination that the damages against Adobe be trebled or for any other basis within the Court's discretion pursuant to 35 U.S.C. § 284;

(F) A finding that this case against Adobe is "exceptional" and an award to Mr. Jaffe of its costs and reasonable attorneys' fees, as provided by 35 U.S.C. § 285;

(G) An accounting of all infringing sales and revenues of Adobe, together with post judgment interest and prejudgment interest from the first date of infringement of the '828 Patent;

(H) Such further and other relief as the Court may deem proper and just.

///
///
///
///
///



PLAINTIFF'S ORIGINAL COMPLAINT

13

CASE NO.

Dated: August 1, 2023

Respectfully submitted,

SCHIFFER, APC

By: */s/Eric M. Schiffer*
Eric M. Schiffer
Email: eschiffer@schifferapc.com
SCHIFFER, APC
7545 Irvine Center Drive, Suite 200
Irvine, CA 92618
Telephone: (949) 533-0485

Christopher E. Hanba (*pro hac vice pending*)
Email: chanba@dickinson-wright.com
Joshua G. Jones (*pro hac vice pending*)
Email: jjones@dickinson-wright.com
DICKINSON WRIGHT PLLC
607 W. 3rd Street, Suite 2500
Austin, Texas 78701
Telephone: (512) 770-4200
Facsimile: (844) 670-6009

Ariana D. Pellegrino (*pro hac vice pending*)
Email: apellegrino@dickinson-wright.com
DICKINSON WRIGHT PLLC
500 Woodward Avenue, Suite 4000
Detroit, MI 48226
Telephone: 313-223-3500

Attorneys for Plaintiff
Jonathan E. Jaffe



PLAINTIFF'S ORIGINAL COMPLAINT      CASE NO.